UNITED STATES DISTRICT COURT
DISTRICT OF MARLAND

DEE DEIDRE FARMER
    712 H Street, NE #8975
    Washington, DC 20002

        Plaintiff,

      v.

                  CASE NUMBER:    GLR 24-CV-1885

STATE OF MARYLAND
Serve: Maryland State Treasurer
    80 Calvert Street, Room 442
    Annapolis, MD 21401

DEPARTMENT OF JUVENILE SERVICES
Serve: Vincent N. Schiraldi, Secretary
    217 East Redwood Street
    Baltimore, MD 21202

Serve Also: Maryland State Treasurer
        80 Calvert Street, Room 442
        Annapolic, MD 21401

        Defendants.

## PRELIMINARY STATEMENT

1.    For generations, Maryland's juvenile detention system has subjected the State's most vulnerable children to unthinkable sexual abuse. Despite years of widespread reports, federal and state investigations, and public demands to close

1

the State's various prison-like facilities, the State of Maryland has long allowed a culture of abuse to flourish in its juvenile detention system. The Plaintiff in this action, a transgender woman, was confined at the Maryland Training School for Boys (hereinafter "The School"), when she was 15-16 years of age. There, Plaintiff was harassed, molested and raped by staff, who were supposed to be watching out for her.

2.      This action is filed pursuant to Maryland's Child Victims Act ("CVA"), Md. Code, Cts. & Jud. Proc. § 5-117. Plaintiff was sexually abused while she was a child in the legal and physical custody of Defendants. Specifically, Plaintiff was sexually harassed, assaulted, and raped by staff at The School, which was operated by Department of Health & Mental Hygiene, Juvenile Services Administration (1969 through 1987), which is now the Maryland Department of Juvenile Services ("DJS," formerly the Department of Juvenile Justice), headquartered in Baltimore, Maryland.

3.      This action alleges physical, psychological, and emotional injuries suffered because of conduct constituting sexual abuse and rape as defined in Md. Code, Cts. & Jud. Proc. § 5-117(a) and elsewhere

4.      While at that facility, Plaintiff was subjected to sexual abuse, including sexual touching, coercion, and forcible rape, by two staff members employed by or acting under the authority of Defendants.

2

5.    The sexual abuse and rape endured by Plaintiff at the hands of Defendants' agents was part of a culture of abuse at The School and existed throughout Maryland's juvenile justice system, which has been well-documented and known to Defendants for decades.

6.    Due to Defendants' negligence in allowing this culture of sexual abuse to flourish and in failing to protect the children in their custody, including Plaintiff, Plaintiff suffered physical, emotional, and psychological trauma, leading to significant anguish and distress that she is forced to live with for the rest of her life.

7.    As set forth in greater detail below, Plaintiff assert state law, reviewable as pendent jurisdiction claims in this Court, for negligence; negligent training, supervision, and retention of employees and agents; negligent failure to enact and enforce policies that would prevent sexual abuse; and violation of Plaintiffs' rights under the Maryland Constitution.

## PARTIES

8.    Plaintiff Dee Deidre Farmer is a 59-year-old transgender woman, residing in the District of Columbia. At all relevant times, Plaintiff was committed to the custody of the Defendants, and confined at the Maryland Training School for Boys in Baltimore County, MD.

9.    Defendant State of Maryland (hereinafter referred to as "State") is a

3

sovereign State of the United States of America. The State operates and controls Department of Juvenile Services (DJS) (formerly Department of Health & Mental Hygiene, Juvenile Services Administration from 1969 to 1987, Department of Juvenile Services from 1987 to 1995, and Department of Juvenile Justice from 1995 to 2003). DJS is, and at all relevant times has been, headquartered in Baltimore, Maryland.

10.    Defendant Department of Juvenile Services (DJS) is a department within the Executive Branch of the State government and is the appointing authority for all persons employed by it, and it is charged with the responsibility and is delegated the power, under Maryland State law, to ensure the care, custody, and control of the people, primarily children, who are housed within its facilities. DJS's principal place of business is 217 East Redwood Street, Baltimore, Maryland. DJS operates and/or operated the Maryland Training School for Boys and other juvenile detention facilities that house and/or housed detained youth in the juvenile justice system:

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction under the federal diversity of citizenship statute, 28 U.S.C. 1332; the parties are residence of different states and the amount in controversy exceeds $75,000.00.

to, this culture of abuse.[1] The sexual abuse at DJS facilities has ranged from inappropriate strip-searches to rape. DJS agents have had, and continue to have, inappropriate and criminal sexual relationships with children at DJS facilities,[2] oftentimes involving bribery and grooming. Children detained in DJS facilities are regularly offered contraband—such as cigarettes, drugs, and alcohol—or privileges in exchange for sexual favors.[3] The pervasive and persistent abuse, including sexual abuse, at DJS facilities has been publicly reported on for decades,[4] leading to the formation of a task force in 1999[5] and an investigation by the U.S. Department of Justice between 2002 and

.

[1] *See, e.g.*, U.S. Dep't of Just., Bureau of Justice Statistics, *Sexual Victimization in Juvenile Facilities Reported by Youth, 2008-09* (Jan. 2010), https://files.eric.ed.gov/fulltext/ED508530.pdf.

[2] *See* U.S. Dep't of Just., Civil Rights Division, *Investigation of the Cheltenham Youth Facility in Cheltenham, Maryland, and the Charles H. Hickey, Jr. School in Baltimore, Maryland*, 13 (Apr. 2004), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/cheltenham_md.pdf.

[3] *See* U.S. Dep't of Just., *supra* note 2, at 14.

[4] *See, e.g.*, Lan Nguyen, *Sex-Abuse Case Forces CYBA to Review Hiring,* Howard County Sun, May 24, 1992, at 4, https://baltimoresun.newspapers.com/image/173724510/; *Prince George's Nurse Indicted on Sex Charges*, The Sun, Aug. 22, 1991, at B3, https://baltimoresun.newspapers.com/image/375938591/.

[5] Kate Shatzkin, *Monitors Begin Their Watch at Youth Facilities*, The Sun, Dec. 15, 1999, at 1, https://baltimoresun.newspapers.com/image/173482911/.

2004.[6] The culture of abuse nonetheless continues to be a reality for children detained in DJS facilities to this day.

16.    Children who are sexually abused in DJS facilities rarely file grievances against staff due to fear of retaliation[7] or knowing that they will not be believed.[8] Children at DJS facilities know that they cannot trust facility staff, who regularly engage in physical abuse of the children charged to their care.[9] When they do witness or learn of sexual assaults, staff members at DJS facilities look the other way and allow it to continue.[10] Upon information and belief, DJS facilities operated for decades without adequate instructions or procedures for children to report abuse, necessitating the U.S. Department of Justice's call for implementation of such procedures as part of a settlement with Defendant State in 2005.[11] Sexual abuse at DJS facilities therefore goes severely underreported.

17.    Nonetheless, there is evidence that rates of sexual abuse at DJS facilities are extraordinarily high. In January 2010, the U.S. Department of Justice issued a report studying incidents of sexual abuse at nearly 200 juvenile detention facilities across the country.[12] The study found Maryland facilities to have some of the highest rates of sexual abuse of any facilities in the country, with over 36% of youth at the DJS's Backbone facility reporting sexual abuse, compared

7

[6] *See* U.S. Dept't of Just., *supra* note 3, at 1.

[7] See Philip J. Merson, Independent Juvenile Justice Monitor, Special Report on Conditions/Incidents at the Charles Hickey School, 1 (May 29, 2003), https://www.privateci.org/private_pics/Hickey.pdf.

[8] *See* Todd Richissin, *Abuse of Teens Persists Despite State's Promises*, The Sun, Nov. 25, 2001, at 9 https://baltimoresun.newspapers.com/image/378208304/ (noting that "prosecutions are rare" and quoting police officer stating that "[y]ou have a group of kids who are locked up for doing some pretty bad things, and . . . they don't make the world's best witnesses").

[9] *See id.* at 1.

[10] *See* Maureen O'Hagan, *Coalition Urges Closing of Md. Youth Facility*, Washington Post, Feb. 23, 2001, https://www.washingtonpost.com/archive/local/2001/02/23/coalition-urges-closing-of-md-youth-facility/3605e311- b90c-4411-b240-b1979ca8f08b/.

[11] *See* U.S. Dep't of Just. & Maryland Settlement Agreement, https://clearinghouse-umich-production.s3.amazonaws.com/media/doc/19513.pdf.

[12] *See* U.S. Dep't of Just., *supra* note 1.

to a 12% average for facilities nationwide.[13] Defendants and their agents have historically underpaid DJS facility staff,[14] provided inadequate training,[15] hired staff with known criminal histories of abuse against juveniles,[16] and implemented and preserved harmful policies like those allowing staff to perform strip searches on children with no reasonable basis[17]—all of which have contributed to the exceptionally high rates of sexual abuse at DJS facilities over the decades.

**B.** The State's Knowledge of Sexual Abuse at DJS Juvenile Detention Facilities

18.     Defendants were aware that sexual abuse of children by facility staff was a persistent and prevalent problem in their juvenile detention facilities. For decades, Defendants have been made aware of the ongoing sexual abuse of children in their care through the investigations and reports by Defendant State's own task force and by the U.S. Department of Justice, studies by third parties, allegations by children at DJS facilities, and criminal proceedings against their employees and agents.

19.     Documented and publicized abuse, and reports of conditions known to be likely to lead to abuse, at DJS facilities include:

    a. In May 1986, a class action was filed against the State regarding abuse of children at the Montrose School (a juvenile detention facility that closed in 1988), alleging "systematic" mistreatment by staff, including allowing an eleven-year-old child to be raped repeatedly by older boys at the facility,[18]

9

[13] *Id.* at 3-4.

[14] *See* Richissin, *supra* note 8, at 9.

[15] *See id.*

[16] *See* U.S. Dep't of Just., *supra* note 2, at 6.

[17] *See* Erica L. Green, *Task Force Calls for Limits on Strip Searches*, The Sun, Dec. 2, 2016, at A15, https://www.newspapers.com/image/263538737/.

[18] *See* Jeffrey A. Butts & Samuel M. Street, *Youth Correction Reform: The Maryland and Florida Experience*, 8 (1988), https://jeffreybutts.files.wordpress.com/1988/07/csyp-md.pdf.

10

b. In February 1991, a counselor at Cheltenham was found guilty of sexually assaulting a child at the facility,[19]

c. In October 1991, a nurse at Cheltenham was indicted on charges that he sexually abused 16 boys at the facility in the space of less than two weeks;[20]

d. In 1995, a report by the Annie E. Casey Foundation studied conditions at Cheltenham and called the facility one of the worst in the country, with poor training and squalid, overcrowded conditions leading to rampant physical abuse;[21]

e. In July 1999, Cheltenham Superintendent Carlton Richardson was demoted and transferred to another facility after it was discovered that a counselor under his supervision impregnated a teen at the facility;[22]

f. In 1999, the State acknowledged that it had fired seven Cheltenham staff members for assaulting children and, in response to public pressure, instituted a task force to monitor ongoing abuse at the facility;[23]

g. In December 1999, a supervisor at Maple Run was charged with child abuse, shortly after a governor's task force investigation found a pattern of abuse at that facility and others;[24]

11

[19] *See* Nguyen, *supra* note 4.

[20] *See* The Sun, *supra* note 4.

[21] *See* Manuel Perez-Rivas, *The Trouble in Youth Detention*, Washington Post, Mar. 22, 2000, https://www.washingtonpost.com/archive/local/2000/03/22/the-trouble-in-youth-detention/56ba2f5c-0b1b-4c5c- 81cc-8ceec86fcf3e/.

[22] *See* Todd Richissin, *Head of Juvenile Jail is Demoted*, The Sun, July 17, 1999, https://baltimoresun.newspapers.com/image/172822422/.

[23] *See* Shatzkin, *supra* note 5, at 28.

[24] *See, Youth Camp Charge Filed; Counselor Accused of Abuse and Assault at Forestry Center; Juvenile Justice Operation; Teenager Tells Police He Was Handcuffed, Dragged in Dirt*, The Sun, Dec. 30, 1999, https://www.baltimoresun.com/1999/12/30/youth-camp-charge-filed-counselor-accused-of-abuse-and-assault-at- forestry-center-juvenile-justice-operation-teen-ager-tells-police-he-was-handcuffed-dragged-in-dirt/.

h.  In 2000, at least two guards at VCC were charged with sexually abusing children at the facility;[25]

i.  In May 2000, three guards at Backbone were fired due to rampant physical abuse of children at the facility:[26]

j.  In February 2001, a coalition of public advocacy organizations called for the closure of Cheltenham, citing physical and sexual abuse at the facility;[27]

k.  In November 2001, a report by The Baltimore Sun found at least a dozen reports of sexual assaults by guards against children across the Cheltenham, VCC, and CHS facilities;[28]

l.  In April 2002, a Cheltenham guard was charged with multiple sex crimes after it was discovered that she had had a week-long sexual relationship with a child at the facility;[29]

m.  In May 2003, a Special Report by Maryland's Independent Juvenile Justice Monitor found multiple instances of sexual relationships between staff and children at CHS;[30]

n.  In April 2004, following a two-year investigation, the U.S. Department of Justice issued a report on the conditions at Cheltenham and CHS, finding (among many other forms of abuse and insufficient care) multiple instances of

13

[25] *See* Richissin, *supra* note 8, at 9.
[26] *See 6 More Fired for Abuse at Boot Camps; 14 Guards Dismissed Since Brutality Allegations Surfaced*, The Sun, May 6, 2000, https://www.baltimoresun.com/2000/05/06/6-more-fired-for-abuse-at-boot-camps-14-guards- dismissed-since-brutality-allegations-surfaced-no-other-choice-officials-say-that-more-terminations-could-be- forthcoming/.
[27] *See* O'Hagan, *supra* note 10.
[28] *See* Richissin, *supra* note 8, at 9.
[29] *See Cheltenham Guard is Charged With Sexual Assault*, The Sun, Apr. 12, 2002, https://web.archive.org/web/20210621162546/https://www.baltimoresun.com/news/bs-xpm-2002-04-12- 0204120381-story.html.
[30] *See* Merson, *supra* note

Sexual relationships between facility staff and children at the facilities and noting that "the facilities have failed to institute adequate measures to prevent incidents such as these from recurring;"[31]

    o. In March 2005, reports emerged about a regular practice by a guard at Noyes forcing children to strip naked and allow the guard and other children to hit them in the groin repeatedly;[32]

    p. In July 2005, the State of Maryland announced that it would be closing CHS due to concerns over conditions and what the State's own governor called "a violation of constitutional rights" and "a living model in what a system should not become;"[33] however, only the treatment center portion of the facility ended up closing, and CHS has continued operating as a detention center to this day;

    q. In May 2006, investigators for Maryland's Independent Juvenile Justice Monitor witnessed and reported on a male Waxter staff member punching a girl in DJS custody while she screamed for him to

14

get off her;[34]

r.  In May 2006, reports on conditions at LESCC and Waxter found that the facilities continued to be sites of child abuse, assaults, underfunding, inadequate training, and overly aggressive staff; Maryland's former Independent Monitor was quoted

---

[31] *See* U.S. Dep't of Just., *supra* note 3, at 13.

[32] *See* Lynn Anderson, *Abuse Alleged at 2 Juvenile Facilities*, The Sun, Mar. 30, 2005, https://www.baltimoresun.com/maryland/bal-te.md.juvenile30mar30-story.html.

[33] *See* Andrew Green, *Oft-Criticized Youth Facility to be Closed*, The Sun, July 1, 2005, https://www.baltimoresun.com/2005/07/01/oft-criticized-youth-facility-to-be-closed/.

[34] *See* Greg Garland, *'Don't Touch Me. Get Off My Stomach.'*, The Sun, May 11, 2006, https://www.baltimoresun.com/news/bs-xpm-2006-05-11-0605110100-story.html.

as saying that these conditions appeared to have been unchanged from his years monitoring DJS facilities;[35]

s.  In August 2006, following a year-long investigation, the U.S. Department of Justice issued a report on the conditions at the BCJJC, finding numerous conditions likely to lead to sexual abuse, including overuse of solitary confinement, lack of staff supervision, and incomplete recordkeeping of staff checks and interactions with children;[36]

t.  In March 2007, a Special Report by Maryland's Independent Juvenile Justice Monitor concluded that Waxter had "outlived its usefulness" and recommended that it be shut down; the Report further noted inadequate training, cruel overuse of solitary confinement, and a dangerous lack of sightlines in the facility's design (making it easier to hide what was going on in the facility);[37]

u.  In December 2009, a report by the Capital News Service detailed efforts by critics, including the American Civil Liberties Union and Advocates for Children and Youth, to shut down Waxter, due to, among many issues, the ongoing abuse of children by unqualified staff;[38]

v.  In December 2016, a task force formed in response to ongoing abuse at DJS facilities recommended that policies finally be put in place to

16

curb the

[35] *See* Mary Otto, *State Centers Still Beset by Problems, Report Says*, Washington Post, May 24, 2006, https://www.washingtonpost.com/archive/local/2006/05/24/state-centers-still-beset-by-problems-report- says/38357e44-2647-4399-b700-08b580276f93/.

[36] *See* U.S. Dep't of Just., Civil Rights Division, *Investigation of the Baltimore City Juvenile Justice Center in Baltimore, Maryland*, 13 (Aug. 2004), https://www.justice.gov/sites/default/files/crt/legacy/2011/04/13/baltimore_juve_findlet_8-7-06.pdf.

[37] *See* Juvenile Justice Monitor Unit, *Special Report on Thomas J.S. Waxter Children's Center – Final Findings and Recommendations* (Mar. 22, 2007), https://www.marylandattorneygeneral.gov/JJM%20Documents/WaxterSpecial3_22_07.pdf.

[38] *See* Kelly Brooks, *Critics Call for Closure of Detention Facility for Girls*, Capital News Service, Dec. 22, 2009, https://thedailyrecord.com/2009/12/22/critics-call-for-closure-of-detention-facility-for-girls/

17

strip-searches of children across DJS facilities statewide, noting that existing policies allowed strip searches to be carried out without any reasonable belief that a child is actually concealing contraband;[39]

> w. In December 2016, the head of DJS in Baltimore voted against the aforementioned task force recommendations on curbing overuse of strip searches;[40]
>
> x. In March 2021, a staff member at VCC was indicted on three counts of child sexual abuse following the discovery of her ongoing sexual relationship with a child at the facility;[41]
>
> y. In October 2021, a juvenile corrections officer at LESCC was indicted for sexual assault of a 15-year-old girl who he had met while she was an LESCC resident;[42]
>
> z. In 2022, Maryland's Juvenile Justice Monitoring Unit reported egregious conditions and abuse across DJS facilities, including that the BCJJC "continues to operate as a prison-like environment" that is "dangerous and often chaotic" for the children housed there.[43]

20.    Defendants are aware that the above reports represent only a fraction of incidents of sexual abuse in DJS facilities, given the prevalence of under-reporting in such environments.[44]

18

[39] *See* Green, *supra* note 17.

[40] *See id.*

[41] *See* Don Aines, *Former Victor Cullen Worker Indicted on Sexual Abuse Charges*, The Herald-Mail, Mar. 26, 2021, https://www.heraldmailmedia.com/story/news/local/2021/03/26/former-victor-cullen-worker-indicted-on- sexual-abuse-charges/115907068/.

[42] *See*, Natalie Jones, *Salisbury Juvenile Corrections Officer Indicted After Alleged Sex With 15-Year-Old Girl*, MyEasternShoreMD.com, Oct. 5, 2021, https://www.myeasternshoremd.com/stardem/news/salisbury-juvenile-corrections-officer-indicted-after-alleged-sex-with-15-year-old-girl/article_8c29a912-77c1-5ca1-932c- dba1377ec7d8.html.

[43] *See* Juvenile Justice Monitoring Unit, *2022 Second Quarter Report*, 27 (Sept. 2022), https://www.documentcloud.org/documents/22924402-jjmu-2022-q2-report-final-including-djs-jsep- response document/.

[44] *See* U.S. Dep't of Just., *Prison Rape Elimination Act Regulatory Impact Assessment*, 17 (May 17, 2012), ("[O]nly a fraction of incidents of sexual abuse in a prison environment will typically come to the attention of correctional authorities or be reflected in institutional records.").

21.    Upon information and belief, Defendants are aware (and have for decades been aware) that the conditions identified in the above reports as connected to sexual abuse (*e.g.*, the failure to adequately screen, supervise, train, investigate, and discipline staff members; the overcrowding of facilities leading to insufficient supervision and enforcement; the failure to provide adequate mental health and support services to residents; and the fostering of a culture of physical violence and intimidation) were and are endemic to all DJS facilities.

22.    Upon information and belief, Defendants are aware (and have for decades been aware) that the conditions identified in the above reports as connected to sexual abuse (*e.g.*, the failure to adequately screen, supervise, train, investigate, and discipline staff members; the overcrowding of facilities leading to insufficient supervision and enforcement; the failure to provide adequate mental health and support services to residents; and the fostering of a culture of physical violence and intimidation) were and are due to a large number of its staffs' addiction to illicit drugs.

## SEXUAL ABUSE/assault OF PLAINTIFF

23.    At all times relevant to the wrongful conduct complained of herein, Plaintiffs was a child under the legal and physical custody, direct and exclusive control, and supervision of Defendants and their agents and officers, who were responsible for Plaintiff's' care and safety.[45]

24.    The sexual conduct complained of herein lacked consent in that Plaintiff did not have the capacity to consent by virtue of being, at all relevant times, a minors and/or in the legal and physical custody of the State juvenile detention system.[46] Moreover, the sexual conduct complained of herein was accomplished using forcible compulsion, undue influence, duress, coercion, intimidation, and/or threat of physical harm and retaliation.

47 For several years, DJS outsourced the operations of CHS to a private contractor, Youth Services International, until the State ended that relationship and took back control of the facility in 2004. *See* Dan Fesperman, *Hickey Turns a Violent Page*, The Sun, Mar. 30, 2004, https://www.baltimoresun.com/2004/03/30/hickey-turns-a-violent-page/. At all times relevant herein, Youth Services International and its employees acted as agents of Defendants, pursuant to Defendants' non-delegable duty to the children in Maryland's juvenile detention system.

[46] In recognition that detained youths lack legal capacity to consent, Maryland state law criminalizes any sexual contact with any individual detained in a DJS facility, regardless of the age of consent. Md. Code Ann., Crim. Law § 3-314©.

25.    Plaintiff was in State custody and confined at The School from about 1981 to 1983.

26.    Plaintiff's original commitment, as referenced above, was for evaluation.

27.    Plaintiff was originally housed on a lock-unit at The School.

28.    Several days after being placed in the lock-unit, as identified above, Plaintiff made a request to staff member, whose name was Mr. Bennett, for a telephone call to her mother

29.    Mr. Bennett told Plaintiff that he would allow her to call her mother during lunch.

30.    During lunch, Mr. Bennett called Plaintiff into the office, which was adjacent to the dayroom.

31.    After Plaintiff entered the office, Mr. Bennett shut the door to the office.

32.    After closing the door, Mr. Bennett unzipped his pants, pulled out his penis, which was erect; and told Plaintiff he would allow her to use the phone after she gave him some "head".

33.    Mr. Bennett, forcing Plaintiff to give him "head," ejaculated in her mouth and told her that she had to swallow it.

34.    On another occasion, Mr. Bennett instructed Plaintiff to clean the bathroom, which was down the hall from the dayroom, and directly across from the locker room.

35.    While Plaintiff was cleaning the shower inside the bathroom, as identified above, Mr. Bennett entered the bathroom, stepped into the shower area, unzipped his pants, pulled-out his penis, and told Plaintiff to "suck it".

36.    When Mr. Bennett told Plaintiff to "suck it," as stated above, she told him that him "no".

37.    When Plaintiff told Mr. Bennett "No," as noted above, he "slapped" her across her face twice.

38.    After Mr. Bennett "slapped" Plaintiff, forcing her into a oral sex act, he "ejaculated" in her mouth.

39.    After Mr. Bennett ejaculated, as noted at 37 above, he left the bathroom.

40.    Mr. E. Ball, who was a staff member at The School, worked evenings in the locked housing unit, where Plaintiff was confined. Mr. Ball entered Plaintiff's room, after the other inmates and her were locked in their rooms for the night, and forcibly raped her' turning her on her stomach, getting on top of her, pulling down her pajamas, and penetrating her anus while holding his hand over her mouth.

41.    Mr. Ball, identified above, entered Plaintiff's room at least seven (7) times and repeated the rape, described at para. 40 above.

42.    At the end of the commitment period for the evaluation, Plaintiff was, after a hearing, committed to The School.

43.    While Plaintiff was no longer in the locked unit, as noted above, Mr. Ball would come to the other units where she was housed and give her money.

44.    When Mr. Ball came to the units, as described above, he would tell Plaintiff that he loved her and would do anything for her.

45.    When Mr. Ball came to the units, as described above, he told Plaintiff that he was going to get her out so they would be together.

46.    One day, when Mr. Ball came to a unit, as described above, Plaintiff informed him that she had been granted a weekend pass.

47.    When Plaintiff told Mr. Ball about her weekend pass, as described above, he told her that he would come and get her and keep her with him.

48.    While Plaintiff was on her weekend pass, Mr. Ball meet her at Howard and Fayette Streets in downtown Baltimore, and took her to a motel, located on Reisterstown Road (near Northern Parkway), where he forced Plaintiff to give him oral sex, and he penetrarted her anus throughout that night.

49.    Mr. Ball was with Y. Bailey, another staff member, when he meet Plaintiff downtown, as noted above.

50.    The following day, Mr. Ball took Plaintiff to his apartment, which was on the grounds of The School, and held her there for two days against her will; repeatedly raping her.

51.    Upon information and belief, Mr. Ball  suffered from mental illness, which was related to his military service.

52.    Upon information and belief, Mr. Ball was a heroin addict.

53.    Upon information and belief, Ms. Y. Bailey was also a heroin addict.

54.    Also, staff members, including S. Sheldon and Mr. Lee, working in the locked unit, who was supposed to be keeping Plaintiff safe, used heroin and.or other illicit drugs,

55.    Upon information and belief, there was a high rate of illicit drug use amongst staff a of The School.

**CAUSES OF ACTION**

**COUNT I: NEGLIGENCE**
**AGAINST DEFENDANTS**

56.    Plaintiff re-allege and incorporate by reference every previous allegation above as if fully stated in this Count.

57.    It is well settled that Defendants have a legal duty to protect children in the juvenile detention system and to provide them with a "safe and humane environment." *State v. Kanavy*, 416 Md. 1, 9 (2010). This duty is non-delegable, and Defendants are vicariously liable for the actions and omissions of their employees and agents.

58.    As established above, sexual abuse of children by staff at DJS facilities was persistent and prevalent, making the risk of sexual abuse foreseeable and imminent. The

Defendants knew or should have known that DJS facilities had a widespread, pervasive history of staff-on-resident sexual abuse. The Defendants knew or should have known that there was a high risk of sexual abuse for children at DJS facilities, including Plaintiffs. The Defendants knew or should have known that Defendants had numerous agents and officers who had sexually abused children at DJS facilities. The Defendants knew or should have known that sex abusers have a high rate of recidivism. Defendants knew or should have known that hiring or maintaining staff, addicted or using illicit drugs, for the supervision of confined minors would subject those minors to an unreasonable risk of sexul abuse and assault  Therefore, Defendants foresaw or should have foreseen the sexual abuse of children by staff at DJS facilities, including the sexual abuse and rape of Plaintiff.

59.    At all relevant times, regarding the allegations contained herein, Plaintiff's sexual abuse and assault was at DJS facility, bystaff members, under the direct supervision, employ, and/or control of the Defendants and/or their agent(s). The Defendants knew or should have known that each of these staff members was a danger to children before they sexually abused and assaulted Plaintiff. Prior to the sexual abuse and assault of Plaintiffs the Defendants learned or should have learned that these staff members were not fit to work with children. The Defendants, by and through their agents, servants and/or employees, became aware, or should have become aware of these staff members' propensities to commit sexual abuse and of the risks to Plaintiff's safety. At the very least, the Defendants knew or should have

known that they did not have sufficient information about whether their supervisors and staff working at DJS facilities were safe for children.

60. The Defendants breached their duties to Plaintiff to use reasonable care to protect her from the foreseeable risk of sexual abuse.

61. The Defendants failed to use ordinary care in determining whether their facilities were safe and/or determining whether they had sufficient information to represent their facilities and/or programs as safe. The Defendants' breach of their duties includes, but are not limited to: failure to protect Plaintiff from a known/suspected danger, failure to supervise staff members supervisinfg children, including Plaintiff, committed to its custody, failure to have sufficient policies and procedures in place to prevent sex abuse, failure to properly implement policies and procedures to prevent sex abuse, failure to take reasonable measures to ensure that policies and procedures to prevent sex abuse were working, failure to adequately inform children of the risks of staff-on-resident sex abuse, failure to investigate risks of staff-on-resident sex abuse, failure to properly train the staff at the facilities and/or programs, failure to train children about the dangers of sex abuse by facility staff, failure to have an outside agency test their safety procedures, failure to protect the children in their facilities and/or programs from sex abuse, failure to adhere to the applicable standard of care for resident safety, failure to investigate the amount and type of information necessary to represent the institutions, programs, leaders and people as safe, and failure to train their employees properly to identify signs of

sex abuse by fellow employees.

62.     The Defendants also breached their duty to Plaintiff by failing to warn Plaintiff of the risks that the abusers posed and the risks of sex abuse against Plaintiff at DJS facilities. The Defendants also failed to warn Plaintiff about any of the knowledge that the Defendants had about the persistent and prevalent sexual abuse against children by DJS facility staff.

63.     Upon information and belief, the Defendants additionally violated their legal duty by failing to report known and/or suspected sex abuse of children by Plaintiff's abusers and/or their other agents to law enforcement.

64.     The Defendants' actions created a foreseeable risk of harm to Plaintiff. As a vulnerable child placed and participating in the facilities and/or programs the Defendants offered that were overseen by poorly trained, insufficiently supervised, and inadequately vetted officers and supervisory staff, Plaintiff was foreseeable victims. Additionally, as vunerable children whom Plaintiff's abusers had access to and full control of through the Defendants' facilities and/or programs, Plaintiff was a foreseeable victim.

65.     At all relevant times, the Defendants' actions were negligent, willful, wanton, malicious, reckless, grossly negligent, and outrageous in their disregard for Plaintiff's rights and safety.

66.     As a direct and proximate result of the above-described conduct, Plaintiff has suffered, and will continue to suffer, great pain of mind and body,

shock, emotional distress, discomfort, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. Plaintiff was prevented, and will continue to be prevented, from performing daily activities and obtaining the full enjoyment of life. She has sustained, and will continue to sustain, loss of earnings and earning capacity. She has incurred, and will continue to incur, expenses for medical and psychological treatment, therapy, and counseling.

67.    WHEREFORE, Plaintiff request a judgment against Defendants for compensatory damages, in an amount exceeding $800,000, together with interest, costs, attorneys' fees, and any other relief deemed appropriate by the Court and allowable under the law.

## COUNT II: NEGLIGENT HIRING, TRAINING, SUPERVISION, AND RETENTION AGAINST DEFENDANTS

68.    Plaintiff re-allege and incorporate by reference every previous allegation above as if fully stated in this Count.

69.    Defendants were at all relevant times responsible for the safety of the children in the custody of DJS. Defendants were at all relevant times responsible for creating and enforcing hiring, training, supervision, and retention policies that ensured the safety of the children in DJS custody. his duty is non-delegable, and Defendants are vicariously liable for the actions and omissions of their employees and agents.

70.     At all relevant times, Plaintiff's abusers were employees and/or agents of the Defendants. Plaintiff's abusers and the Defendants (or Defendants' agents) were therefore in employee–employer type relationships. As employees and/or agents of the Defendants, Plaintiff's abusers were under the direct supervision, management, and control of the Defendants and/or their agent(s) at all relevant times during their interactions with Plaintiff. Plaintiff's abusers engaged in the wrongful conduct complained of herein while acting in the course and scope of their employment with the Defendants (or Defendants' agents) and/or accomplished the sexual abuse by virtue of their job-created authority.

71.     At all relevant times, the Defendants had a duty rising from their (or their agents') employment of Plaintiff's abusers, to ensure that Plaintiff's abusers did not sexually abuse children in State custody, including training and supervising them to ensure they did not sexually abuse children in State custody. Further, at all relevant times, Defendants had a duty to investigate inappropriate behavior on their part, and to discipline them appropriately, including by terminating their affiliations with the Defendants.

72.     The Defendants were negligent in their hiring, training, and supervision of Plaintiff's abusers in that they knew, or should have known, through the exercise of ordinary care, that the conduct of Plaintiff's abusers would subject third parties to an unreasonable risk of harm, including the propensity of Plaintif's' abusers to sexually abuse children in their charge.

73.    Plaintiff's abusers were given regular, direct, ongoing access to Plaintiff and other residents during the course and scope of their duties, when the Defendants knew or should have known that they presented an unreasonable risk of harm to children.

74.    The    Defendants breached their duties to Plaintiff by actively maintaining and employing Plaintiffs' abusers in positions of power and authority through which they had access to children, including Plaintiff, and power and control over children, including Plaintiff,

75.    The Defendants were negligent in their retention of Plaintiff's abusers in that they knew, or should have known, through the exercise of ordinary care, that the conduct of Plaintiffs' abusers subjected third parties to an unreasonable risk of harm, including Plaintiff's abusers' sexual abuse of children in their charge.

76.    In failing to timely remove Plaintiff's abusers from working with children or terminate their employment, the Defendants failed to exercise the degree of care that a reasonably prudent person would have exercised under similar circumstances, which resulted in Plaintiff's injuries alleged in this action.

77.    Additionally, the Defendants owed a duty to train and educate employees and administrators and establish adequate and effective policies and procedures calculated to detect, prevent, and address sexual abuse of children by DJS facility staff.

78.    The Defendants were negligent in the training and instruction of their

agents and employees. The Defendants failed to timely and properly educate and train, supervise, and/or monitor their agents or employees about policies and procedures that should be followed when sexual abuse of a child is suspected or observed.

79.    In negligently hiring, training, supervising, and retaining Plaintiffs' abusers, and in failing to establish such training procedures for employees and administrators, the Defendants failed to exercise the degree of care that a reasonably prudent person would have exercised under similar circumstances.

80.    was reasonably foreseeable to the Defendants that their failure to exercise reasonable care would result in sexual abuse of children in DJS custody, including Plaintiff.

81.    Plaintiff would not have suffered the foreseeable harm complained of herein but for the Defendants' negligent hiring, training, supervision, and retention of Plaintiff's abusers and the negligent training and instruction of their other agents and employees.

82.    At all relevant times, the Defendants' actions were negligent, willful, wanton, malicious, reckless, grossly negligent, and outrageous in their disregard for Plaintiff's rights and safety.

83.    As a direct and proximate result of the above-described conduct, Plaintiff has suffered, and will continue to suffer, great pain of mind and body, shock, emotional distress, discomfort, physical manifestations of emotional

distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. They were prevented, and will continue to be prevented, from performing daily activities and obtaining the full enjoyment of life. She has sustained, and will continue to sustain, loss of earnings and earning capacity. She has incurred, and will continue to incur, expenses for medical and psychological treatment, therapy, and counseling.

84.     WHEREFORE, Plaintiff request judgment against Defendants for compensatory damages, in an amount exceeding $800,000.00 together with interest, costs, attorneys' fees, and any other relief deemed appropriate by the Court and allowable under the law.

## COUNT III: NEGLIGENT FAILURE TO ENACT AND ENFORCE POLICIES THAT WOULD PREVENT SEXUAL ABUSE

85.     Plaintiff re-allege and incorporate by reference every previous allegation above as if fully stated in this Count.

86.     Defendants were at all relevant times responsible for the safety of the children in the custody of DJS. Defendants were at all relevant times responsible for creating and enforcing policies and practices that ensured the safety of the children in DJS custody. This duty is non- delegable, and Defendants are vicariously liable for the actions and omissions of their employees and agents.

87.     Despite knowing of the history and high risk of sexual abuse against children by DJS facility staff, Defendants recklessly disregarded those risks and

failed to enact new policies or enforce existing policies intended to protect children from sexual abuse by DJS facility staff.

88.     Despite knowing of the high risk of sexual abuse of children at DJS facilities, Defendants cultivated a culture that enabled DJS facility staff to prey on children's vulnerabilities and deliberately disregarded a widespread practice of DJS facility staff abusing children.

89.     DJS staff were able to have frequent, unmonitored, and solo access to children in their control for significant periods of time. DJS staff worked together to enable sexual abuse of children and help each other avoid detection, and they retaliated against children who reported abuse or took steps to protect themselves. DJS supervisors knew that there was ample opportunity for sexual abuse of children by staff at DJS facilities, and that it in fact occurred, but failed to take appropriate action to address it.

90.     Upon information and belief, Defendants allowed DJS facility staff, including Plaintiffs' abusers, to choose their own assignments without regard to the number or severity of prior allegations made against them by residents.

91.     Defendants failed to enact adequate instructions or procedures for children in DJS custody to report sexual abuse.

92.     Defendants failed to enact adequate rules and policies to monitor and discipline staff engaged in behavior that constitutes warning signs of sexual abuse, such as spending a disproportionate amount of time talking to a particular resident,

repeatedly requesting a particular resident for a particular assignment, discussing

their personal life with a resident, or asking a resident personal question. Staff were

not disciplined or informally counseled when supervisors witnessed behavior that

is indicative of warning signs of sexual abuse.

93.    Defendants failed to employ obvious measures to reduce the risk of

sexual abuse of children at DJS facilities and to prevent misconduct from occurring,

escalating, or continuing. These include measures such as heightened monitoring of

situations where there have been warning signs of sexual misconduct or

inappropriate relationships; preventing staff access to a resident who has made

allegations of sexual misconduct against staff while the allegation is investigated;

searches of staff; use of lie detectors; real-time review of video camera feeds;

periodic review of camera footage; use of electronic recording devices; exit

interviews of residents upon transfer and release; random interviews of staff and

residents; and frequent, varied and unannounced rounds by supervisory officials.

94.    Defendants failed to ensure that investigators applied consistent

standards in determining whether to substantiate an allegation of staff sexual

misconduct and refer it for administrative action or timely obtain physical evidence

when such evidence was available.

95.    Defendants failed to ensure that investigators gave weight to indicia of

sexual misconduct in the absence of physical evidence, including evidence of staff

persons being seen out of place; staff persons engaging in behavior suggestive of

an inappropriate relationship; and staff giving contradictory statements to investigators.

96.    Defendants failed to ensure that investigators gave adequate weight to the credibility of resident witnesses and failed to ensure that investigators did not give undue weight to statements of staff.

97.    Defendants failed to ensure that investigations into allegations of sexual abuse were thoroughly and timely conducted and, thus, they often resulted in biased and unreliable refusals to substantiate residents' complaints.

98.    Defendants failed to ensure that their investigations gave adequate weight to similar prior complaints of sexual misconduct against the same staff member. Such patterns may include allegations that a staff member has used the same language in propositioning or threatening more than one resident or allegations that a staff member has taken more than one resident to the same location to engage in sexual abuse.

99.    Defendants created a culture, custom, and practice of ignoring sexual abuse and assault by failing to investigate or discipline staff members who knew of instances of sexual abuse, assault, or harassment against children by DJS facility staff and failed to report such information.

100.    Defendants failed to take sufficient action when staff members left their assigned posts, went to areas of the facility where they had no work-related reason to enter and engaged in behavior that is clearly suggestive of sexual abuse.

101.    Defendants failed to promulgate policies that provided for additional rounds to more closely supervise staff about whom complaints of sexual abuse had been made. Staff who were the subject of credible or repeated allegations of sexual abuse were allowed to continue their usual posts and permitted to access private or unmonitored areas. They were even permitted to continue to guard or have contact with or proximity to residents who had complained about them.

102.    Defendants failed to require unpredictable supervisory rounds. Facility supervisors routinely conducted rounds in a predictable manner, failing to vary their time, frequency and point of entry, leaving staff able to predict periods of time, such as the time around shift change or after a supervisor had passed through, when they would virtually be assured that they could engage in sexual abuse without being discovered.

103.    At all relevant times, the Defendants' actions were negligent, willful, wanton, malicious, reckless, grossly negligent, and outrageous in their disregard for Plaintiffs' rights and safety.

104.    As a direct and proximate result of the above-described conduct, Plaintiff has suffered, and will continue to suffer, great pain of mind and body, shock, emotional distress, discomfort, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. Plaintiff was prevented, and will continue to be prevented, from performing daily activities and obtaining the full enjoyment of life. She has

sustained, and will continue to sustain, loss of earnings and earning capacity. They have incurred, and will continue to incur, expenses for medical and psychological treatment, therapy, and counseling.

105.    WHEREFORE, Plaintiff each individually request judgment against Defendants for compensatory damages, in an amount exceeding $800.000.00 together with interest, costs, attorneys' fees, and any other relief deemed appropriate by the Court and allowable under the law.

**COUNT IV: VIOLATION OF THE MARYLAND STATE CONSTITUTION, DECLARATION OF RIGHTS ART. 24: SUBSTANTIVE DUE PROCESS AGAINST DEFENDANTS**

106.    Plaintiffs re-allege and incorporate by reference each previous allegation above as if fully stated in this Count.

107.    At all times relevant to this claim, Defendants breached their duty to ensure that, pursuant to the Maryland State Constitution, Article 24 of the Maryland Declaration of Rights, Plaintiffs not be deprived of their substantive due process right to bodily autonomy.

108.    Deprivation of substantive due process was inflicted upon Plaintiffs by employees and/or agents of Defendants while Plaintiffs were in the legal and physical custody of Defendants.

109.    Deprivation of substantive due process was inflicted upon Plaintiff when employees and/or agents of Defendants sexually abused Plaintiffs, as

described above.

110.    The actions of these employees and/or agents of Defendants, which resulted in deprivation of Plaintiff's substantive due process, occurred within the course of their duties and within the scope of their employment.

111.    Defendants are vicariously liable for the violations of Plaintiff's substantive due process rights perpetrated by Defendants' employees and/or agents.

112.    Defendants enabled, allowed, condoned, and authorized Plaintiff's abusers to commit the above-described sexual abuse and to deprive Plaintiff of substantive due process, due to the acts and omissions described above, including, but not limited to, failing to adequately and reasonably screen, supervise, train, investigate, and discipline Plaintiff abusers.

113. Defendants enabled, allowed, condoned, and authorized Plaintif's abusers to commit the above-described deprivation of substantive due process upon Plaintiff, due to the acts and omissions described above, including, but not limited to, failing to protect and to ensure the safety of residents, including Plaintiffs, from reasonably foreseeable acts of sexual abuse perpetrated by DJS facility staff, including Plaintiffs' abusers.

114. WHEREFORE, Plaintiffs each individually request judgment against Defendants for compensatory damages, in an amount exceeding $800,000.00 together with interest, costs, attorneys' fees, and any other relief deemed appropriate by the Court and allowable under the law.

## COUNT V: VIOLATION OF THE MARYLAND STATE CONSTITUTION, DECLARATION OF RIGHTS ART. 24: PATTERN AND PRACTICE (*LONGTIN* CLAIM)
### AGAINST DEFENDANTS

115. Plaintiff re-allege and incorporate by reference each previous allegation above as if fully stated in this Count.

116. At all times relevant to this claim, Defendants utterly failed to train, supervise, or discipline DJS employees and/or agents with regard to the prevention of the sexual abuse of children under DJS

care.

117.    This repeated failure, despite notice of widespread sexual abuse, constitutes a pattern and practice of allowing such sexual abuse to occur, in violation of Plaintiff's rights under the Maryland State Constitution.

118.    Defendants enabled, allowed, condoned, and authorized Plaintiffs' abusers to commit the above-described sexual abuse, in violation of Plaintiff's constitutional rights, due to the acts and omissions described above, including, but not limited to, failing to adequately and reasonably screen, supervise, train, investigate, and discipline Plaintiffs' abusers.

119.    Defendants enabled, allowed, condoned, and authorized Plaintiff's abusers to commit the above-described sexual abuse, in violation of Plaintiff's constitutional rights, due to the acts and omissions described above, including, but not limited to, failing to protect and to ensure the safety of residents, including Plaintiffs, from reasonably foreseeable acts of sexual abuse perpetrated by DJS facility staff, including Plaintiff's abusers.

120.    WHEREFORE, Plaintiff rerequests judgment against Defendants for compensatory damages, in an amount exceeding

$800,000.00 together with interest, costs, attorneys' fees, and any other relief deemed appropriate by the Court and allowable under the law.

## COUNT VI: VIOLATION OF THE MARYLAND STATE CONSTITUTION, DECLARATION OF RIGHTS ART. 25: CRUEL AND UNUSUAL PUNISHMENT AGAINST DEFENDANTS

121.    Plaintiffs re-allege and incorporate by reference each and every previous allegation above as if fully stated in this Count.

122.    At all times relevant to this claim, Defendants breached their duty to ensure that, pursuant to the Maryland State Constitution, Article 25 of the Maryland Declaration of Rights, cruel and unusual punishment not be inflicted on Plaintiffs.

123.    Cruel and unusual punishment was inflicted upon Plaintiffs while Plaintiffs were in the legal and physical custody of Defendants.

124.    Cruel and unusual punishment was inflicted upon Plaintiffs when employees and/or agents of Defendants sexually abused Plaintiffs, as described above.

125.    The actions of these employees and/or agents of Defendant, which resulted in the subjection of Plaintiffs to cruel and unusual punishment, occurred within the course of their duties and

within the scope of their employment.

126.    Defendants are vicariously liable for the subjection of Plaintiff to cruel and unusual punishment through the actions of Defendants' employees and/or agents.

127.    Defendants enabled, allowed, condoned, and authorized Plaintiff's abusers to commit the above-described sexual abuse and to inflict cruel and unusual punishment upon Plaintiffs, due to the acts and omissions described above, including, but not limited to, failing to adequately and reasonably screen, supervise, train, investigate, and discipline Plaintif's' abusers.

128.    Defendants enabled, allowed, condoned, and authorized Plaintiffs' abusers to commit the above-described sexual abuse and to inflict cruel and unusual punishment upon Plaintiffs, due to the acts and omissions described above, including, but not limited to, failing to protect and to ensure the safety of residents, including Plaintiff, from reasonably foreseeable acts of sexual abuse perpetrated by DJS facility staff, including Plaintiffs' abusers.

129.    WHEREFORE, Plaintiff each individually request judgment against Defendants for compensatory damages, in an amount exceeding $800,000.00 together with interest, costs, attorneys' fees,

and any other relief deemed appropriate by the Court and allowable under the law.

## **PRAYER FOR RELIEF**

**WHEREFORE,** by reason of the foregoing, Plaintif hereby pray for judgment against the Defendants, jointly and severally, for compensatory damages for all present, past, and future suffering; together with interest, costs, and expenses; attorneys' fees; and all such further and additional relief as the Court deems just, fair, and appropriate under the circumstances and allowable under the law.

Respectfully submitted,

Dee Deidre Farmer
712 H Street, NE #8975
Qahinston, DC 20002

Dated: June 22, 2024